930 F.2d 913
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Kenneth T. BROOKS, Defendant-Appellee.
 No. 90-5302.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 7, 1991.
Decided April 19, 1991.
 
 Appeal from the United States District Court for the District of South Carolina, at Columbia. Karen L. Henderson, District Judge. (CR-89-220)
 Eric William Ruschky, Assistant United States Attorney, Columbia, S.C. (Argued), for appellant; E. Bart Daniel, United States Attorney, Columbia, S.C., on brief.
 Susan Zalkin Hitt, Assistant Federal Public Defender, Columbia, S.C., for appellee.
 D.S.C.
 AFFIRMED.
 Before PHILLIPS, MURNAGHAN and NIEMEYER, Circuit Judges.
 PHILLIPS, Circuit Judge:
 
 
 1
 The government appeals the district court's grant of a two level sentencing reduction for acceptance of responsibility and the court's decision to depart downward from the sentencing guidelines. We find that the court's determination on acceptance of responsibility was not clearly erroneous. In addition, we find that the court's decision to depart from the guidelines was not clearly erroneous, and the extent of the departure was not an abuse of discretion. We now affirm the decision of the district court.
 
 
 2
 * In May 1989, Kimberly Brooks, a member of the United States Air Force, left her husband of two years, Kenneth Brooks, and moved onto Shaw Air Force Base, Sumter, South Carolina. About a month later Kimberly obtained a restraining order from the Sumter County Family Court, prohibiting Kenneth from coming to any location where Kimberly, or their son Mashod, was present, except for permitted visitation purposes.
 
 
 3
 After moving out, Kimberly's furniture remained in storage until July 16, 1989. On that day, Kimberly met Kenneth at a neutral location and he gave her the key to the storage shed. Later that same day, Kimberly, assisted by Kenneth Pittman and Greg Guinyard, moved her furniture from the shed to her home. After moving the furniture, Pittman and Guinyard remained at Kimberly's house, talking, playing cards, and drinking beer. About 9 p.m., Kenneth called Kimberly to say that he had some hardware for her furniture that he would bring to her house on his way to work that night. About 11:30 p.m., Kenneth knocked at Kimberly's door. On Guinyard's suggestion, she let Kenneth in.
 
 
 4
 What then happened was the subject of much dispute at trial. The prosecution's evidence was that Kenneth initiated an argument with Kimberly, during which he struck her. Pittman testified that he stepped into their dispute, and that Kenneth shoved him away. Pittman asserted that Kenneth then pulled out a knife and, after Kenneth stabbed him, he responded by hitting Kenneth with a broken broomstick. When Pittman then got Kimberly's gun, Kenneth fled.
 
 
 5
 According to Kenneth, however, things happened somewhat differently. Kenneth testified that as he approached the door to Kimberly's house, he heard a man yelling at his son Mashod. He stated that upon entering the house:
 
 
 6
 I went in the kitchen area, where Kenneth and Kim was, and I asked them was he hollering at my son, you know, and from there I say something to Kim, like, "You wrong for having them here this late and having them holler at your son and you here."
 
 
 7
 Later in his testimony, Kenneth repeated that he had been concerned about someone yelling at his son. While denying that Mashod had been mistreated, at trial both Kimberly and Pittman confirmed that Kenneth had expressed concern about mistreatment of Mashod. Pittman testified that Kenneth said: "Don't mess with my son, don't play with my son."
 
 
 8
 Kenneth further testified that he confronted Kimberly, telling her that she should not be allowing these men to yell at Mashod. He stated that Pittman then approached the couple, and kicked Kenneth. A fight then ensued, in which Pittman struck Kenneth with the broken broomstick. Only then, Kenneth testified, did he pull out a knife, swinging wildly and accidentally stabbing Pittman.
 
 
 9
 Whatever the actual course of events, Pittman was hospitalized for five days and underwent exploratory surgery to determine the extent of the knife wounds.
 
 
 10
 Kenneth's defense at trial was limited to justification, and in his direct testimony, he apologized to Pittman for wounding him. The jury convicted Kenneth for assault with a dangerous weapon, in violation of 18 U.S.C. Sec. 113(c). At sentencing, the district court determined the base sentencing level for the offense to be 15, and added 8 additional points for use of a dangerous weapon and for serious bodily injury. Based on its evaluation of the defendant, the probation report, and letters from counselors working with defendant, the court granted him a two level decrease for acceptance of responsibility. The court then departed from the guidelines on the basis of Kenneth's unusual state of mind at the time of the incident, including stress and despondency, and because the court believed Kimberly to be partially responsible for the incident. Based on those factors and on defendant's strong family and employer support, his lack of criminal record, and the court's general sense of the case, the court departed downward from the guidelines by eleven levels sentencing defendant to three years probation, with special conditions of six months community confinement and mental health counseling.
 
 
 11
 The government now appeals, contending that the court erred in granting the two level reduction for acceptance of responsibility as well as in departing downward from the sentencing guidelines.
 
 II
 
 12
 The government argues that the district court erred in granting Brooks a two level reduction for acceptance of responsibility. Sentencing Guideline Sec. 3E1.1(a) provides for such a reduction "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." In addition, application note 5 in the commentary to this section of the guidelines states:
 
 
 13
 The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review and should not be disturbed unless it is without foundation.
 
 
 14
 We therefore review the record to determine whether the district court had any foundation for its determination.
 
 
 15
 The court had before it considerable evidence that Kenneth had accepted responsibility for his actions. On direct examination, unsolicited, he apologized to Pittman. The probation officer opined that Kenneth had confronted his problems, admitted his culpability, and expressed contrition. Finally, the court received letters from his counselors--at a rehabilitation center where he voluntarily sought help--which confirmed that Kenneth had indeed accepted responsibility for his act and was making every effort to prevent such unacceptable behavior from recurring. In light of this substantial evidence, we cannot say that the decision of the district court was clearly erroneous or without foundation, and we affirm the court's grant of a two level reduction for acceptance of responsibility.
 
 III
 
 16
 The government next argues that the court's downward departure from the guidelines was not warranted in law and fact. We disagree.
 
 
 17
 We have prescribed a three-step process for determining whether to depart from the sentencing guidelines. First, the particular aggravating or mitigating circumstance must not have been adequately taken into consideration by the Sentencing Commission; second, the facts of a case must support a finding of this sort of aggravating or mitigating circumstance; and third, the particular circumstances of the case must be of sufficient magnitude and importance to justify a departure. United States v. Summers, 893 F.2d 63, 66 (4th Cir.1990).
 
 
 18
 The district court here gave as its essential reason for departing the defendant's unusually distraught emotional condition at the time of the offense. The court noted that he was already suffering from extraordinary stress and despondency going into the altercation, and that this condition was then exacerbated by the circumstances, largely created by his wife, that immediately prompted the assault for which he was convicted.
 
 
 19
 The sentencing guidelines specifically address the appropriateness of considering mental and emotional condition of the defendant in departing from the guidelines. Section 5H1.3 states that "[m]ental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the guidelines" (emphasis added). The guidelines therefore, on their face, imply that only ordinary, i.e., normally expectable, mental and emotional conditions attending involvement in any criminal conduct, were considered by the Commission in fixing sentencing ranges; that no effort was made to anticipate and factor in the wide variety of other, extraordinary mental and emotional conditions that might afflict particular defendants. We therefore hold that a sentencing court properly can take into account extraordinary mental and emotional conditions, i.e., conditions outside those normally to be expected in connection with any criminal conduct, in determining whether a departure is warranted.
 
 
 20
 Next, we conclude that the facts upon which the district court here relied in deciding to depart support its finding of such an extraordinary mental and emotional condition. As indicated, the court relied both upon the defendant's unusually distraught condition going into the critical events and upon the factors, including his estranged wife's conduct, which exacerbated that condition immediately before the physical altercation. There was evidence before the court that the defendant was already in a state of extreme despondency and emotional instability growing out of the break-up of his marriage before the evening of the assault. A short time before, he had shot himself in the stomach in an apparent suicide attempt. There was further evidence that in this state, he came upon a situation in which his wife was partying with two men in the presence of his young son, who was being disciplined by one of the men. We are satisfied that the district court properly could find in these circumstances the type of extraordinary mental and emotional condition which the guidelines specifically contemplate may be taken into account as the basis for a departure.
 
 
 21
 Finally, we conclude that the nature of the particular mitigating circumstance found here was such as to justify the significant departure made by the district court.
 
 
 22
 The court properly relied on the facts that the defendant voluntarily had sought counseling help; that he had no history of criminal conduct but did have a record of consistent employment; and that the probation officer had opined that defendant was not a violent person and would not constitute a future threat to others. The court did not abuse its discretion in concluding from these circumstances that the sentence resulting from the downward departure would serve the needs of public safety, deterrence, and rehabilitation.
 
 
 23
 We therefore affirm the judgment.
 
 
 24
 AFFIRMED.
 
 
 25
 MURNAGHAN and NIEMEYER, Circuit Judges, joined.